Connor, John P., J.

INTRODUCTION

Assabet Valley Collaborative (“Collaborative") contracted with Waltham Central School Transport, Inc. (“Waltham Central”) to provide transportation services to special education students, among them, Kristen Reguera (“Kristen”), the daughter of plaintiff Susan Reguera (“Reguera”). Waltham Central employed Harold Leduc (“Leduc”) as a van driver. Leduc committed various crimes against Kristen during the 1999-2000 school year and was subsequently convicted of those crimes in 2001. Reguera then filed the present action against Leduc, Waltham Central and the Collaborative. The Collaborative moves for Summary Judgment on grounds that Reguera did not comply with the presentment requirements set forth in G.L.c. 40, §4E *5 and that the Massachusetts Torts Claims Act (the “Act”) provides immunity to it pursuant to G.L.c. 258, §10(]j.

BACKGROUND

Considered in a light most favorable to the plaintiff, the non-moving party, the facts and reasonable inferences drawn from them follow. Mass.R.Civ.Proc. 56(c). Kristen, a minor child at all the relevant times, was and is mentally and physically handicapped, confined to a wheelchair. She attended Tahanto Regional School (“Tahanto”) and a summer program at Whittier Rehabilitation Hospital (“Whittier”) as a special needs student requiring daily transportation to school and to extra-curricular activities. Tahanto is a member of the Collaborative.
The Collaborative is a public entity formed, pursuant to G.L.c. 40, §4E, by member school districts to support local services, predominantly for special needs students. One of the Collaborative’s responsibilities is to provide without charge transportation services for its many students. G.L.c. 71B, §3. The Collaborative arranged and paid for, but did not itself provide, round-trip transportation from Kristen’s home in Berlin, Massachusetts to Tahanto, the extracurricular programs, and Whittier.
Waltham Central had been providing transportation services under contract to the Collaborative for nearly twenty years. The Collaborative procured transportation services for its students pursuant to G.L.c. 30B.[3] Along with other vendors, Waltham Central submitted a bid to the Collaborative to provide transportation for two years from 1996-1998. During the bidding process, the Collaborative did not inquire whether there had been complaints about a bidding company’s drivers. The Collaborative awarded one of the transportation contracts (“Contract”) to Waltham Central. The Contract was extended by agreement of the parties from 1998 to 2000. Upon award of the Contract, Waltham Central provided daily transportation for most special need students of the Collaborative’s member districts, among them, Kristen. Under the terms of the Contract, Waltham Central was responsible for buying and maintaining the buses and vans, and hiring, training, and supervising its bus and van drivers. In addition, the Contract specified that the contractor who hired the van driver was responsible for employing drivers who were morally fit and had no criminal record. The Collaborative provided annual in-service training to Waltham Central drivers in August 1995, 1996, 1997, and 1998.
Waltham Central hired Leduc as a van driver in 1983. Leduc held a valid School Pupil Transport License, also known as a “7D” license, issued to him by the Registry of Motor Vehicles (“RMV j that was due to expire on September 2, 2000.[4] Waltham Central received no complaints about Leduc from 1983 until May 18, 2000 and was not aware of any disciplinary or legal action taken against Leduc prior to the May 18, 2000 incident. Leduc attended the Collaborative’s annual training each August. He completed the Collaborative’s Driver Information Form (“DIF”) indicating that he had not been arrested in the prior three years, had not been stopped for speeding in the prior three years, and had not had his driver’s license suspended or revoked. During his tenure with Waltham Central, Leduc was arrested for domestic assault and batteiy in 1991 and later investigated for assault on a handicapped woman by the Marlborough Police Department in 1998. Neither incident resulted in a conviction.
During the 1999-2000 school year, Leduc worked as a “wheelchair driver,” that is, operating the lift for access to and egress from the van, escorting a student, to his or her residence when family members were unavailable, and driving the van. During that school year, Leduc sexually assaulted Kristen and was convicted in 2001 on four counts of assault and battery on a child under the age of fourteen occurring on three different occasions.[5] Leduc also pled guilty to two charges of indecent assault and batteiy on a child under the age of fourteen, and open and gross lewd and lascivious behavior on another child which occurred after the first three assaults on Kristen and before the last assault on Kristen. Waltham Central first learned of problems with Leduc on May 18, 2000 after Kristen reported the assault to Reguera.
The Collaborative provided students’ parents with a Transportation Handbook (“Handbook”). The Handbook stated that the drivers were “eager to provide safe, courteous, and dependable transportation” to school children. Yet it did not interview Leduc, review his background or references, or make an independent determination of his suitability for the position as a van driver. Its monitoring of Leduc was limited to requesting annual evaluations from parents. Prior to the attacks, the plaintiff had annually rated Leduc’s courtesy as excellent.
On October 30, 2001, Reguera sent the Collaborative a “To Whom It May Concern” demand letter (“October letter”) pursuant to G.L.c. 93A, alleging that the Collaborative negligently hired and supervised Leduc and breached a contract which led to Kristen’s injuries. On November 6, 2001 the Collaborative responded, informing Reguera that: 1) her letter did not comport with the requirements of presentment pursuant to G.L.c. 258; 2) that no employer-employee relationship existed between Leduc and the Collaborative; and 3) the Act provided immunity under §10(j). On December 20, 2001, Reguera filed a complaint in Superior Court naming Leduc, Waltham Central and the Collaborative as defendants. As to the Collaborative, she claimed breach of contract, breach of implied contract, and loss of consortium. On January 2,2002, Reguera, through counsel, sent a subsequent letter (“January letter”) to Dr. Alan Chates (“Chates”), the Executive Director of the Collaborative, invoking the Act. In its January 5, 2002 response, the Collaborative again noted Reguera’s failure to comport with the *6 presentment requirements, the lack of employee-employer relationship between Leduc and itself and invoked §10(j) of the Act as an immunity defense.
Reguera next amended her complaint on June 20, 2002, claiming against the Collaborative, generalized negligence (Count IV), negligent hiring, retention, and supervision (CountV), negligent infliction of emotional distress (Count VI), breach of contract (Count VII), and breach of implied contract (Count VIII).

DISCUSSION

Summary judgment is appropriate when the moving party shows that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983). When evaluating a summary judgment motion, the court looks at the evidence in the light most favorable to the non-moving party. See Mass.R.Civ.P. 56(c); O’Sullivan v. Shaw, 431 Mass. 201, 203 (2000). The moving party bears the burden of establishing the absence of a triable issue. Pedersen v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party meets this burden, the burden shifts to the non-moving party to allege specific facts establishing the existence of a general issue or issues of material facts; he may not rest merely on the pleadings. Correllas v. Viveiros, 410 Mass. 314, 317 (1991); Godbout v. Cousens, 396 Mass. 254, 261 (1985). “[A] party moving for summary judgment in a case in which the opposing party [has] the burden of proof at trial is entitled to summary judgment if [it] demonstrates, by reference to material described in Mass.RCiv.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Summary judgment is appropriate when a plaintiff has not made proper presentment under the Act. Dattoli v. Hale Hospital 400 Mass. 175, 178 (1987).
By statute, an educational collaborative, through its board of directors, is a public employer. G.L.c. 258, § 1; G.L c. 40, §4E. Section 4E provides for the creation, management, and funding of an educational collaborative. G.L.c. 40, §4E. As a public entity, the educational collaborative has standing to be sued to the same extent as city, town, or regional school district. Id. A board of directors operates and manages an educational collaborative and has the authority to enter into contracts. Id. The board of directors employs an executive officer who is responsible for the care and supervision of the educational collaborative and serves under the direction of the board of directors. Id.
A civil action may not be instituted against a public employer unless the claimant first presents her claim in writing to the executive officer of the public employer within two years of the date on which the cause of action arose and the claim has been fully denied by the executive officer in writing. G.L.c. 258, §§4 and 5; Vasys v. Metro. Dist. Comm’n, 387 Mass. 51, 55 (1982). This is so because the executive officer possesses the overall financial and budgetary responsibility for the public employer including the authority to settle damage claims under the Act. G.L.c. 258, §5; Weaver v. Commonwealth, 387 Mass. 43, 48 (1982).
Section one of G.L.c. 258 identifies the appropriate executive officer of specific public employers, such as the mayor of a city or the secretary of an executive agency. In instances where the executive officer of the public employer is not specified, the executive officer is “the nominal chief executive officer or board.”[6] G.L.c. 258, § 1. When the statute has not specified the executive officer upon whom presentment is required, presentment has been determined to be insufficient when made to administrators or directors. Weaver v. Commonwealth, 387 Mass. at 48; Antonio v. City of Peabody, 51 Mass.App.Ct. 655, 660 (2001); Johnson v. Trustees of Health and Hospitals of the City of Boston, 23 Mass.App.Ct. 933, 935 (1987). The fatal flaw with those presentments was that they were not made to one who had the authority to compromise or settle claims. Weaver, 387 Mass. at 48; Antonio, 51 Mass.App.Ct. at 659; Johnson, 23 Mass.App.Ct. at 933.
In the present case, the executive officer of the Collaborative falls into the category of “in the case of any other public employer” because it is not specifically enumerated in the Act’s definitions of public employers. Thus, the executive officer of the Collaborative is “the nominal chief executive officer or the board.” Accordingly, Reguera was required to present her claim to the chief executive officer or board. This she did not do. Presentment to ‘To Whom it May Concern” in the October letter clearly fails because it does not identity anyone with authority to settle claims. From a plain reading of the salutation, one cannot reasonably infer that Reguera intended for the letter to go to the Collaborative’s board of directors or anyone in particular. The letter does not refer to the Act but does allege that the Collaborative negligently hired and supervised Waltham Central and Leduc, thus failing to ensure Kristen’s safety, causing Kristen’s harm by Leduc’s criminal acts which sounds in tort. Subsequent presentment to Chates, as Executive Director, in the January letter fails because he was not the executive officer with the authority or power to settle claims. By statute, the Board has the authority to “employ an executive officer.” G.L.c. 40, §4E. At the relevant time, Chates was the Collaborative’s “executive director,” employed to run and supervise the Collaborative. Reguera has not shown that Chates was, in fact, the “nominal chief executive officer” or a member of the Board with the authority to settle claims. Accordingly, the January letter to Chates did not comport with the presentment requirements under the Act. Thus, Reguera has not satisfied the condition precedent to filing her complaint.
Even if Reguera’s presentment letter under the Act was sufficient, her claim must fail because the Collaborative is immune from liability under § 10(j) of the Act. Under § 10(j), a public employer is immune from liabil *7 ity for “any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.” G.L.c. 258, §10(j); Brum v. Town of Dartmouth, 428 Mass. 684, 692 (1999) (requiring an affirmative act on the part of a governmental entity to forfeit immunity shield).
In the present case, Reguera alleges that the Collaborative negligently hired Waltham Central and Leduc and then negligently failed to supervise them, and, in particular, Leduc. The Collaborative has shown that it contracted with Waltham Central to provide transportation services to students, among them Kristen. It hired Waltham Central by way of a statutory procurement process in which Waltham submitted a winning, competitive bid. In addition, the Collaborative and Waltham Central had been doing business for eighteen years when the assault on Kristen occurred. Reguera has not countered with any evidence to show that the Collaborative, in fact, negligently hired Waltham Central.
The Collaborative did not hire Leduc or have a contractual relationship with him. Rather, Waltham Central had the contractual duty to hire, train, and supervise van drivers, perform background checks, and ascertain that drivers held a valid 7D license. Reguera has not countered with any evidence to show that the Collaborative employed Leduc or was responsible to supervise him. In her deposition, Reguera concedes that Waltham Central provided transportation, that the Collaborative did not hire or supervise Leduc, that Leduc was an employee of Waltham Central and not the Collaborative, and that the Collaborative made no guarantee of safe transportation. In addition, there was evidence to show that the Collaborative, in conducting annual in-service training, required Leduc to complete a DIF, the answers to which would not raise a suspicion that he was unfit to operate a school bus, particularly in light of his valid 7D licenses and positive annual transportation satisfaction surveys. Thus, it cannot be said that Leduc acts resulting in Kristen’s harm were originally caused by the Collaborative. Even if Leduc was acting on behalf of the Collaborative as an employee of Waltham Central fulfilling its contractual obligations to the Collaborative, it cannot be said that the Collaborative affirmatively acted in such a manner to cause Kristen’s harm for the same reasons. Accordingly, Reguera has not shown that a genuine issue of material fact exists in the claims of negligent hiring or supervision that she asserts against the Collaborative.
As to the two remaining counts alleging breach of contract and breach of implied contract against the Collaborative, Reguera has not proffered evidence to show the existence of a material fact that would survive summaiy judgment. There is no contract between a student and her school system. Education is a matter of statutoiy right. G.L.c. 71, §1. This right extends to special needs students, G.L.c. 71B, §3, and includes the obligation to provide transportation without cost, id.; G.L.c. 71, §8.
Reguera alleges that Kristen suffered harm as a third-party beneficiary of the contract between Waltham Central and the Collaborative in which they each breached their contractual duties to the other. In simplest terms, the Collaborative was to pay Waltham Central a sum of money to transport Kristen in its vehicle with its driver. Reguera has failed to show how the Collaborative breached that contractual duly to Waltham Central. The relevant facts and inferences derived from them are that Waltham Central was contractually obligated to hire, train, and supervise school bus and van drivers, to perform criminal background checks, and to ascertain that drivers had the requisite 7D license. The Collaborative, by agreement with Waltham Central, provided one day of annual in-service training to Waltham Central drivers. During that in-service training, the Collaborative required drivers to complete the DIF. If Leduc was morally unfit to transport children, the party with potential for liability is Waltham Central, not the Collaborative. See, Market Services Agen., Inc. v. Tifco, 402 Mass. 401, 405 (1988).

ORDER

For the foregoing reasons, Defendant Assabet Valley Collaborative’s Motion for Summaiy Judgment is ALLOWED.

 G.L.c. 30B governs the procurement process for most goods and services between Massachusetts’ cities, towns, districts, and counties and private vendors.

 The Registrar of Motor Vehicles issues School Pupil Transport Licenses or “7D” licenses, valid for twelve months, when the applicant for a license: 1) has been duly licensed to operate a motor vehicle for continuous preceding three years; 2) is physically qualified to operate a vehicle; 3) shows evidence of good moral character; and, 4) has paid an annual application fee. G.L.c. 90, §8 1/2. A person convicted of rape, an unnatural act, sodomy, or the use, sale, manufacture, distribution, or possession with intent to distribute, or trafficking of any controlled substances which are unlawful is prohibited from receiving a license. Id.

 In addition, Leduc was found guilty of posing or exhibiting a child in nude state and possession of child pornography.

 G.L.c. 258, §1 defines the “executive officer of a public employer” as the “the secretary of an executive office of the commonwealth, or in the case of an agency not within the executive office, the attorney general; the adjutant general of the military forces of the commonwealth, the county commissioners of the county, the mayor of a city; the selectmen of the town or as designated by the charter of the town, the board, directors, or committee of a district in the case of the public employers of a district, and, in the case of any other public employer, the nominal chief executive officer or board.”